May it please the Court, I want to cut right to the heart of the issue here. Did this Court's decision in MIT-1 completely preclude the use of software to program or control a static correction circuitry as recited in Claim 1 of the MIT patent? This Court decided in MIT-1 that a static correction circuitry was not limited by Section 112.6 as a means plus function claim limitation. And we also decided that circuitry is limited to hardware, right? Correct, Your Honor. So, why are you here? We're here because you remanded, not only on that issue, you also remanded to include Windows Software as an accused product in the case. At the same time, you told the District Court to further clarify and define static correction circuitry as appropriate. We asked the District Court to impose a hardware definition for static correction circuitry. But you stipulated that you lose if the construction we gave in the first MIT decision was followed. I think that... Am I correct? Yes, we did. Yeah, so? But the question here, though, is whether or not, although it be hardware, circuitry is hardware, we've never disputed that it's not hardware, that that cannot be controlled or programmed by software. Yes, this Court was correct. Circuitry is hardware, and we agree with that. We said it's not just that it's hardware, that it's limited to hardware. Correct. The circuitry itself is limited to hardware. But, as the patent teaches, and what Dr. Schreiber told the public his intention was, although it be hardware, there was a software system that controlled this hardware and that programmed it. Specifically, if you take a look at figure three in the MIT patent, there are three modules at the very beginning. The color balance module, the gradation module, and the luminance-chromance balance module, all of which use software processes to alter the appearance signals and to create the visually aesthetically pleasing signal that the operator wants. Further, Dr. Schreiber's contemporary article, which was incorporated by reference into the patent, and which this Court didn't review and didn't cite in its opinion, expressly states to the public, the system that we've built is a hardware system, albeit that runs an image processing operating system on top of it, and which uses application software. If you look in the record at A2392-93, that article expressly discloses that the aesthetic corrections, the image manipulations and editing, are done by software. I believe that's correct. As long as the door is open for exactly what Dr. Schreiber disclosed to the public, that this hardware circuitry can be programmed and controlled by software. We held specifically in the first MIT case, we conclude that the term aesthetic correction circuitry is clearly limited to hardware, and you stipulated that if that construction is correct, you lose. Right? We would lose. Yeah. Correct. Nevertheless, there's a distinction here between what is hardware and what is programming or controlling hardware. We don't believe that your decision said that the hardware circuitry can't be controlled or programmed by hardware. You said the circuitry itself is hardware, and we don't dispute that. And if your decision was that hardware can play no role in it, then our argument has to be that that's manifestly unjust in view of the public record that Dr. Schreiber provided to the world of what his invention included. It seems to me that you basically have a quarrel with our prior decision that this phrase is limited to hardware and doesn't include software. Aren't you disagreeing with that? I'm not disagreeing that the circuitry itself is hardware. In the infringement case that we have, the hardware is the central processing. And it's also clear, and it's also conceded, that the alleged infringing products are all software. Correct. But it's an indirect infringement argument that their software, the Windows operating system that you included as an accused device or an accused product in this case, is used with hardware. That's also stipulated, that it's always used with a CPU, with monitors, with the computer hardware. Let me ask you something. After we had rendered our previous opinion in this case, did you seek the hearing in any way relating to the question of hardware versus software? We did not. In fact, instead we asked the court to clarify below that although these... But you did not seek it from us. You didn't say, we please clarify that this does not preclude hardware and software together. No, we did not. We took your directive, which was to further define this term as appropriate to the district court, and we asked the district court to define it in that manner. And the district court... You think we were telling the district court to overrule our decision? I don't think so. No, I don't think we were doing that. I certainly think, though, that the district court was presented with a complete record on remand, and that record certainly reflected that the hardware of the aesthetic correction circuitry was indeed programmed or controlled by software. And the district court, although it recognized that, said its hands were tied. And we think that that took the decision in MIT one too far, and that's why we're here. The bottom line on the hardware-software issue is the intrinsic evidence that Dr. Schreiber incorporated our reference into the patent and the patent itself, including Claim 13, for example, all include software processes. In fact, we have the only evidence of record on Claim 13, which depends from Claim 1, is that the random-access memories that are used to convert the appearance signals into those that the operator desires are a software process. Microsoft didn't produce any evidence to rebut that. So we have in the claim language a software process. We have throughout the patent the description of these tone-scale memories. These are the items that are used to convert the signals into that which the operator wants as being software. And then we have Dr. Schreiber's article, which repeatedly says that this is an image-processing system running software that's doing this. So if you find that your MIT one opinion precludes software at all, we would ask you to think that, again, as something that's manifestly in just in view of the intrinsic record, which under your principles of claim construction should allow for software to program or control hardware. The second issue that the district court got wrong was whether or not this aesthetic correction circuitry has to act directly upon the appearance signals as they come from the scanner. That can't be correct in view of the patent's disclosure in Figure 1, which shows when a scanner is not an alternative grant. I'm sorry? That was an alternative grant, right? That was an alternative grant. We ask that that also be reversed because in Figure 1 it clearly shows that there are several intervening steps and processes and a conversion process between the scanner and the aesthetic correction circuitry. If we were to disagree with you on your first point, we don't reach the second point, do we? You wouldn't have to. No, we would be done if that were the case. I'm going to reserve my time for rebuttal. Mr. Hardin? May it please the Court. Dr. Shriver's article doesn't really add anything. In fact, Dr. Shriver's article confirms this Court's judgment in MIT-1, which is, in fact, the law of the case. But for purposes of argument, I would quote Dr. Shriver from A2593 where he talks about the color translation module at issue. That's the module that makes the aesthetic corrections. He says, The CTM is a hardware unit operating under digital video signal, which is displayed on the TV. Now, I really don't want to go back into all these arguments because the first point made by the Court is the point. We have a law of the case doctrine. This case fits squarely in it. There was no request for rehearing to this Court en banc. There was no appeal to the Supreme Court. This Court's decision, which clearly was not dictated, was clearly a considered holding, which clearly was within its obligation to construe claims de novo on appeal, is the law of the case. That's really the end of that issue and the end of this case. I will not take any more of the Court's time except to note the following with respect to directly upon. Using this Court's decision, we went back to the district court, said to the district court, We'd like you to do two things, district court. We'd like you to enforce in the definition that you would have to read to a jury this Court's finding, the first panel's finding, that this circuitry, the physical circuitry, is hardware and does not include software. We asked for that. The second thing we asked for was, we think something, a limitation, an explanation to the jury of what is already in the claim. That is that these aesthetic corrections operate directly on the appearance signals. It's clear from the words of the claim that's true. And to back that up, we pointed to prosecution history where Dr. Schreiber, on numerous occasions in the prosecution, in order to distinguish his invention from other color correction modules and systems that operated on ink values, electronic values that represented inks instead of visual appearance. He said, that's different. That's not what I'm doing. I'm operating on these visual tri-stimulus appearance signals. All he said to the court below was, We think those two restrictions, limitations, should be read to the jury if this case is tried. That's all we asked for there. That's all we asked for here. Thank you very much. The reference Mr. Harden just read, A2593, is actually not from the article that was incorporated by reference into the MIT patent. That's a different article after the fact. Again, the proper article is A2392 through A2393. In the section of software and operator interaction is the heading on that. And the court can review that and see that it clearly is a software process being described. I want to go back to the procedural posture that we had in MIT-1. In MIT-1, the question before the court was whether or not 112-6 applied to aesthetic correction circuitry. The court below, the district court, found that the hardware-software issue was not right and did not decide that issue at that time. Instead, the court said that the parties hadn't submitted evidence on the issue of hardware and software being equivalents, let alone being something that the court had to decide in the context of the 112-6 question. So what came up to you on review the first time was 112-6. Microsoft raised the hardware-software issue in its brief in MIT-1. We correctly told this court that that issue wasn't right, that it hadn't been decided below, and therefore we did not go into that issue on the appeal in MIT-1. On remand, we have now fully brought in the record with the expert testimony of Dr. Bovik, with the MISHRA thesis, which was Dr. Scheider's graduate student's thesis that describes a software-based processing system, and the Dr. Scheider's article. So we have now given the court a complete record. In the APEX case that Microsoft relies on, in that case there were similar issues. There were issues of whether there's a certain kind of circuitry, interface circuitry, and other circuitry was within the ambit of 112-6. And the court in that case, on one issue that was fully presented below, in which there were dictionary definitions available and were provided to the court, found that 112-6 didn't apply, and then gave the textbook definition for interface circuitry. But on the other circuitry issues in that case, the court said the record wasn't complete and remanded. What are you saying? That we shouldn't have decided that issue in the prior appeal? I don't think you should have. So you said the record wasn't complete. The district court thought it wasn't complete, but we concluded that there was enough in the record. We said that we used the word clearly in describing it. See, something I don't understand is why you're making this argument. It's not unusual when an appellate court reverses and sends it back saying there's going to be a new trial or further proceedings, also to say, and on the remand, this is going to be an issue in the case, and we can decide this now to simplify the proceedings on remand. And that seems to be what we may have done there. What's wrong with that? Well, in MIT 1, this court didn't say that it had a complete record on the hardware-software issue. The only mention that it gave of the record was that there was a disclosure in the preferred embodiment of hardware processes in the aesthetic correction service. But what we said was the specification supports it, didn't we? The specification, I believe the rule says the specification didn't require that software be included, that it didn't require it. That's different than the specification. We said the specification limits it to hardware. We relied on the specification. We relied on the dictionary definition of circuitry, and that addressing the circuitry issue was directly relevant to the question of whether this is a means-plus-function case which shows sufficient structure. The court did not review the articles that were incorporated by reference into the patent, which are part of the patent. We have to discuss everything? I think it's extremely important here where the MIT group told the world, this is our system that we've built, this is what we're used to practice. And it... What we said in this opinion at page 1356 was, the last paragraph, the specification describes the components of the CTM as hardware components, and then we quoted various things, and when we refer to the next page, we refer to the specification's repeated description of the circuit itself as involving hardware. And you also did recognize that it also disclosed software processes, but didn't require that software be part of the circuitry. I've just asked the court to reconsider the impact of Dr. Shriver's article, where he tells the public that all application software runs under an image processing operating system developed at MIT. This is on A2392, and then goes on to tell the public that the operator using the microcomputer of this system can make aesthetic corrections through software. Thank you. Thank you. All rise. Thank you.